**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                          **CASE NO: 8:13-cr-121-T-35MAP**

**KRISTIAN KERON GREEN**

_____/

**ORDER**

**THIS CAUSE** comes before the Court for consideration of Defendant Kristian Keron Green's Renewed Motion for Judgment of Acquittal and, in the alternative, Motion for New Trial (Dkt. 110), and the Government's Response in opposition thereto.   (Dkt. 112)   Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** Defendant Green's Renewed Motion for Judgment of Acquittal and **GRANTS** the alternative Motion for New Trial.  (Dkt. 110)

**I.   PROCEDURAL BACKGROUND AND COURSE OF TRIAL**

On March 5, 2013, Kristian Keron Green ("Defendant"), and Joshua Antoin Chatmon ("Chatmon") were charged in a three-count indictment stemming from a December 4, 2010 armed  robbery of a Circle K convenience store. (Dkt. 1)  The robbery was committed by at least two disguised perpetrators.  One of the disguised perpetrators carried a gun, which was inadvertently discharged during the robbery injuring the convenience store clerk.  According to the Government two[1] other participants to the

_____

[1] According to the Government, two participants waited in the car while the two perpetrators committed the robbery.  Surveillance video shows the two rear doors of the getaway car opening

1

robbery waited in or near the getaway car while the two disguised perpetrators committed the robbery. Chatmon entered into a plea agreement with the Government in this case and has admitted to being the disguised perpetrator who carried the gun. (Dkt. 29) Eddie Thomas ("Thomas"), a co-conspirator separately convicted for this robbery, claims to have helped plan the robbery of the convenience store and claims that he waited in the getaway car during the robbery. Leonard Palmer ("Palmer"), a participant in the robbery but not charged with the crime, claims to have helped plan the robbery of the convenience store but claims that he waited in or near the getaway car during the robbery. According to the Government, the remaining disguised perpetrator of the robbery was Defendant, Kristian Keron Green. Chatmon, Thomas, and Palmer were all intended Government witnesses in Defendant's trial.

### a. Separation Request and Rule of Sequestration

In anticipation of Defendant's trial, the Government sent the United States Marshals a memorandum dated February 18, 2014, requesting the separation of inmates: Eddie Thomas, Joshua Chatmon, Leroy Williams, and Defendant. In the memorandum, the Government stated:

> Mr. Green is going to trial . . . on March 4, 2014. Messrs. Thomas and Chatmon will be called as witnesses in the [G]overnment's case, and it is possible that Mr. Williams will as well. Also, the [G]overnment has submitted a writ for the production of Daniel Rachard Lee. To the extent possible, please keep him separate from Mr. Green as well. Any separation should be maintained upon completion of the trial as well.

---

shortly before the robbery, the inference being that there were two passengers in the rear of the vehicle and two in the front seat. However, the video surveillance does not conclusively establish that there were four individuals in the getaway car.

On March 4, 2014, Defendant's jury trial began.  (Dkt. 80)  After opening statements, Defendant invoked the rule of sequestration, prohibiting potential witnesses from listening to or discussing the testimony of other witnesses prior to giving their own testimony.

### b. Trial Testimony

As its first witness, the Government called Kenneth LeCesne, a representative from MetroPCS, who testified as to Defendant's phone number and phone records. Sandy O'Neil, the market manager in the Tampa Bay area for Heineken USA, followed LeCesne's testimony.   Thereafter, Randy Howington ("Howington"), the convenience store clerk, testified that on December 4, 2010, two African American men entered the convenience store with their faces covered, pointed a gun at her, and demanded that she "give up the money."  Howington further testified that as she was getting the money from the register, the gun discharged and injured her finger.  Even as she was suffering from an injured and bleeding finger, Howington stated, and video surveillance showed, that the perpetrators continued to insist that she retrieve the money, which she did.  She was forced to give them $40.00.

After Howington's testimony, the Government called Vickie Meyer, a managerial employee of Circle K, to testify.  Next, the Government called Ariel Martinez ("Martinez"), a deliveryman who was in the convenience store parking lot during the robbery, to testify. Martinez testified that he saw two African  American men running from the convenience store to a car.   The Government then called Sam Bunch, the state detective who investigated the armed robbery.  During Detective Bunch's testimony, the Government asked Detective Bunch to step down briefly and called Jeffrey Burt, the federal agent who also investigated the case, to the stand.  Agent Burt testified regarding the chain of

custody of several cell phones offered by the Government as evidence in the case.  The Court adjourned for the day after Agent Burt's testimony concluded.

### i. Palmer's Violation of the Rule of Sequestration

On March 5, 2014, day two of the jury trial, the direct and cross-examination of Detective Bunch was completed.   Detective Bunch's testimony included information regarding the contacts made between the cell phones of Chatmon, Thomas, Palmer, and Defendant before and after the robbery occurred.   During the cross-examination of Detective Bunch, the Court took a short recess.  At that time the Government informed the Court that at some point during Detective Bunch's testimony that morning, Palmer was sitting in the courtroom against instructions that he had been given not to observe the testimony of other witnesses.   Also at that time, defense counsel informed the Court that Chatmon and Defendant had contact with each other that morning in the transportation line in violation of the no contact rule in place.

After the completion of Detective Bunch's testimony, Palmer was called to the stand outside the presence of the jury to answer questions regarding his presence in the courtroom when Detective Bunch was on the stand.   Palmer testified that when he arrived that morning he went straight into the courtroom because he was late.  (Dkt. 110-1 at P. 6-7)  According to Palmer, he did not remember ever being instructed not to enter the courtroom.  (Id.)   While he was in the courtroom, the Government was questioning Detective Bunch about a cell phone that did not belong to Palmer and that was projected on the screen.  (Id.)   Palmer testified that he was not really paying attention to the testimony and that he was only in the courtroom for about three or four minutes before counsel directed him to leave.  (Id. at P. 6)  Agent Burt then testified that he instructed

4

Palmer about a week or so before trial that he was to go to the witness room outside the courtroom when he arrived for the trial. (Id. at P. 10-11)   Defense counsel moved to strike Palmer as a witness for his violation of the rule of sequestration. (Id. at P. 9)   The Court then instructed the Government to call its next witness and advised that the issue of Palmer's violation would be dealt with when the Court had made a decision. (Id. at P. 11)

### ii.  Thomas's Testimony

The Government stated that it intended to call Thomas as its next witness and that the Marshals would need to retrieve him from his holding cell. (Id. at P. 11-12)   In light of the information that the Court had just received regarding the possible contact between Chatmon and Defendant in the transport line that morning, the Court admonished the deputy marshal that there was a no contact rule in place and that extra precautions should be taken to ensure that no other incidents of contact occurred. (Id. at P. 12)   The deputy marshal acknowledged the Court's directive and retrieved Thomas and escorted him into the courtroom.   Thomas took the stand.   Before the Government's examination began, the Court asked Thomas if he had talked to anyone about this case since it had started on the previous day.   Thomas answered, "No."

The Government questioned Thomas from around 11:16 A.M. until around 12:02 P.M., when the Court adjourned for lunch.   (Dkt. 83)   The questioning concerned all aspects of the events at issue, and Thomas's testimony was very specific as to the details of the night in question.   Thomas testified that his best friends were Defendant, Chatmon, and Palmer.   He testified that he met Chatmon at age eleven or twelve and that he met Palmer and Defendant in high school; after high school the four friends remained close

and hung out together daily.  As to the night of the robbery, Thomas testified that initially, he, Chatmon, and Palmer were just driving around Lakeland.  At some point, Defendant called Thomas and the group went to pick him up from his home.  Afterwards, Thomas testified that all four of the men were driving around Lakeland in his brother's car—he was in the driver's seat, Palmer was in the passenger seat, and Chatmon and Defendant were both in the backseat.  According to Thomas, he and Palmer went into the Circle K convenience store about thirty minutes before the robbery to purchase a tobacco product and while in the convenience store concluded that the store would be a good robbery target.  After deeming the convenience store a good target, Thomas testified that the group created a plan to rob the store—Defendant and Chatmon would enter and rob the store while Palmer and Thomas waited in the getaway car.  Thomas also testified that the group decided that Chatmon would carry the gun during the robbery.   Before breaking for lunch, the Court informed Thomas that he was not at liberty to discuss his testimony or his impending testimony with anyone during this break.  The Court directly asked Thomas, "Do you understand that?" to which Thomas replied, "Yes."

Thereafter, outside the presence of the jury, the Court addressed the issue of Palmer's violation of the rule of sequestration that had occurred earlier in the morning during Detective Bunch's testimony regarding Thomas's phone records.  The Court determined that granting Defendant liberal cross-examination of Palmer regarding the testimony that Palmer had observed would be sufficient to cure any potential taint stemming from Palmer's violation of the rule, should Palmer's testimony move in that direction.  Accordingly, the Court denied the motion to strike Palmer as a witness.

After the lunch recess, the Government's direct examination of Thomas continued from 1:27 P.M. until around 2:19 P.M.   During the Government's remaining direct examination of Thomas, Thomas testified about how the group carried out the plan to rob the Circle K.   Thomas testified that Chatmon and Defendant jumped out of the car to rob to store while he and Palmer waited in the car.  Afterwards, Thomas testified that Chatmon and Defendant ran back to the car.   Once back in the car after the robbery, Thomas testified that Chatmon said that the gun discharged in the store because Defendant had cocked the gun in the car before the robbery and then handed the gun to Chatmon. According to Thomas, after the robbery, he tried to drive away from the Circle K and made a wrong turn.  Thomas testified that after his wrong turn, it was subsequently decided that someone else would drive.  Thomas testified that he did not recall who drove.

Next, Thomas testified that the group went back to the apartment that he and Chatmon shared.   In the next day or so, Thomas testified that his mother informed him that the police wanted to question him regarding the robbery.  Thomas testified that he then had discussions with Chatmon and Palmer about what they should do next.  Thomas stated that Defendant was not involved in the discussions and that he, Chatmon, and Palmer decided to manufacture a fake story to tell the police.  Thomas testified that he and Palmer eventually went to the police station where they were questioned separately regarding the robbery.  Thomas testified that he initially told the police that he and Palmer went out to a club in Tampa, picked up two girls, and then took them back to Lakeland with them on the night of the robbery.  While driving back to Lakeland, Thomas told the police that two men ran out in front of their car with guns, jumped in the car, and ordered Thomas and Palmer to drive them across town.  Thomas next told the police that he and

Palmer dropped the carjackers off across town and then dropped the girls off somewhere else.  According to Thomas, the police suspected the story was false.  Thomas stated that after the police told him that they did not believe his story and that his story was inconsistent with Palmer's, Thomas told the police that he knew who committed the robbery.  Ultimately, Thomas told the police that Chatmon and Defendant were with him and Palmer that night and that Chatmon and Defendant were the masked individuals who had robbed the convenience store.

### iii.  Thomas and Chatmon's Intentional Violation of the Rule of Sequestration

After the Government's examination of Thomas, the defense cross-examined him from approximately 2:19 P.M. to 3:57 P.M.  (Dkt. 83)  During the cross-examination, Thomas was asked when he had last seen Chatmon.  In response he stated, "Just in the back."  Through further questioning, it was revealed that Thomas was sharing the same holding cell in the courthouse as the Government's key witness and co-Defendant, Joshua Chatmon.  After discovering that Chatmon and Thomas were confined in the same cell despite the Government's[2] request that they be sequestered from one another and the Court's directive that they be held separately, the Court inquired of Thomas, outside the presence of the jury, regarding his contact and communication with Chatmon.

As to contact, Thomas testified that he and Chatmon were transported together from the Pinellas County jail to the United States District courthouse.  At the Pinellas

---

[2] The Court notes that the Government did not have any involvement in the violation of the rule of sequestration.  Although the Government's letter requesting the separation of witnesses could have been written more clearly, the U.S. Marshals failed to separate the witnesses despite the Government's request and the Court's directive.  Notably, there was not an overwhelming number of criminal defendants or criminal witnesses who needed to be housed in the available cells in the courthouse.  The Marshals office could not offer any justifiable explanation for this error other than lack of attention to detail and oversight.

County jail, Chatmon and Thomas sat across from each other in the transport area for around ten minutes while waiting to get on the transport van.  In the transport van, Chatmon and Thomas were sitting across from each other for forty-five minutes to an hour.  Once the van reached the courthouse, the two were moved to the same holding cell, where they remained together for forty-five minutes or more.  Thereafter, the two were moved together to the eleventh floor in the courthouse, where they remained together in the same holding cell for twenty minutes.  Subsequently, the two were moved together to the same holding cell on the tenth floor, where they waited to be called to testify for the Government and against Defendant.  Thomas was called first to testify. After testifying for a portion of the morning, the Marshals escorted Thomas back to the same holding cell with Chatmon for the midday break.  Thomas stated that one of the Marshals informed him not to speak with Chatmon.  Thereafter, Chatmon and Thomas were moved downstairs together for lunch and then moved back to the tenth floor, returning to the same joint holding cell, where they continued to wait to be called to testify.

As to communication, Thomas initially only admitted that he and Chatmon discussed their amazement that Defendant chose to pursue this matter to trial.  Thomas vehemently denied engaging in any discussion of his testimony and the facts of the robbery.  However, after repeated inquiry by both the Court and defense counsel, a warning of the penalties of perjury, and being advised to assume that his conversation with Chatmon was video and audio-taped,[3] Thomas's testimony "evolved."  Thomas admitted that prior to his testimony he and Chatmon discussed their own plea

---

[3] On day two of trial, when the issue of the violation initially arose, the deputy marshal advised the Court that the conversations were video and audio-taped.  On the following day, the deputy marshal informed the Court that he was mistaken and that the video recordings of Thomas and Chatmon in the holding cell did not, in fact, include audio-recording.

agreements.  Thomas also admitted that the two discussed the details of the robbery, including who cocked the gun before the robbery and who was holding the gun during the robbery.  Thomas further admitted that during the Court's midday break, he and Chatmon discussed the questions that the Government asked, including questions about Thomas's background and their relationship with each other and Defendant prior to the robbery.

After hearing from Thomas, the Court inquired of Chatmon concerning his conversations with Thomas.  Chatmon testified that prior to Thomas's testimony, they discussed who drove the getaway car after the robbery.  Chatmon testified that he told Thomas that Palmer drove the getaway car after the robbery when it was determined that someone other than Thomas should drive.  Thomas told Chatmon that he believed that the Defendant was the one who drove.  According to Chatmon, Thomas then changed his opinion as to who was driving based on this conversation.  It is apparent that after realizing that Chatmon would contradict his intended testimony that Defendant was driving the getaway car, Thomas altered his testimony to advise that he did not recall who was driving the car after he, Thomas, relinquished the role as getaway driver.

Other than discussing the driver of the getaway car post-robbery and their surprise that Defendant was going to trial, Chatmon initially testified that they did not discuss anything else.  Like Thomas, however, Chatmon's testimony evolved after the Court asked additional questions and directed him to assume that his conversation with Chatmon was video and audio-taped.  Chatmon testified that he and Thomas discussed matters concerning the gun used during the robbery.  Chatmon told Thomas that prior to the robbery, while they were in the getaway car, Defendant cocked the gun and because Defendant cocked the gun, it went off accidentally during the robbery.  Chatmon further

revealed that during the midday break, he asked Thomas what types of questions the Government asked despite the deputy marshal's directive to both Thomas and Chatmon that they not speak to one another.   Thomas obliged Chatmon, telling him that the Government asked questions about the gun, phone logs, text messages, their friendship, and details concerning the sequence of the events on the night of the robbery.

After inquiring of Thomas and Chatmon regarding their contact and communication and hearing argument from the Parties, it was apparent that after the unlawful communication Thomas had changed at least a portion of his testimony and feigned a loss of memory so as not to contradict the intended testimony of Chatmon.   Furthermore, the Government conceded that at no time prior to his trial testimony had Thomas ever stated that Defendant was the one who cocked the gun.   Unfortunately, it can never be fully ascertained to what extent Thomas and Chatmon collaborated their stories, as each demonstrated a willingness to lie to the Court even after their violation of the rule of sequestration was revealed.   In light of the blatant violation of the rule of sequestration and tainted testimony, Defendant moved to strike the testimony of Thomas in its entirety and to strike Chatmon as a witness.   (Dkt. 83)   The Court granted Defendant's motion.   (Dkt. 84)   Subsequently, the Court instructed the jury to disregard Thomas's testimony in its entirety and polled the jury to see whether they could disregard Thomas's testimony. Each juror advised that he or she could fully disregard Thomas's testimony.

### iv.  Palmer's Testimony

On March 6, 2014, the third day of trial, the Government called Palmer as a witness.  (Id.)  Palmer testified that his best friends in high school were Chatmon, Thomas, and Defendant and that all four friends continued to hang out after high school.  (Dkt. 110-

2 at P. 8-11)   Regarding the night of the robbery, Palmer testified that he, along with Chatmon and Thomas, went out to a club and had drinks.   (Id. at P. 18, 21)   At some point, Defendant called Thomas. (Id. at P. 21-22)   Thereafter, Palmer, Chatmon, and Thomas all went to pick up Defendant from his house, with Thomas driving.   (Id.)   After picking up Defendant, Palmer testified that the four men drove around Lakeland for a while. (Id. at P. 22)   Eventually, they stopped at the Circle K, where Palmer and Thomas entered the store.   (Id. at P. 23-24, 26)   Thomas bought a tobacco product from the clerk in the store.   (Id. at P. 28)   Afterwards, Palmer and Thomas returned to the car where Chatmon and Defendant were waiting and Thomas drove away.   (Id.)   Next, Palmer testified that Chatmon, Thomas, and Defendant began arguing about going back and robbing the store.   (Id. at P. 30-31)   Specifically, Palmer testified that Chatmon and Defendant were arguing over who would carry the gun during the robbery.   (Id. at P. 31-33)   Palmer testified that he thought that Chatmon went into the store with the gun. (Id. at P. 33)

When they returned to the store, Palmer testified that Chatmon and Defendant exited the backseat of the car and entered the store.   (Id. at P. 33, 35)   Palmer identified both Chatmon and Defendant in the still photographs from the surveillance video of the robbery that were offered as Government exhibits in the case.   (Id. at P. 35-37)   Palmer testified that he was one hundred percent certain that Defendant was one of the masked perpetrators of the robbery.   (Id. at P. 38)   Palmer then testified that Chatmon and Defendant ran back to the car and said that they had shot the lady inside.   (Id. at P. 40) According to Palmer, while Thomas was driving away from the robbery, Chatmon and Defendant were arguing over whose fault it was that the gun went off inside the store.

(Id. at P. 40-41)   Although Palmer stated earlier that he never saw the gun in the car before the robbery (Id. at P. 40), when asked why Chatmon and Defendant were arguing, Palmer stated that he thought Defendant had the gun in the backseat and maybe he had cocked it before the robbery.  (Id. at P. 40-41)   Also according to Palmer, Thomas drove down a dead end street following the robbery and had to turn around.   (Id. at P. 42) Palmer testified that Thomas drove the entire time; at no point did anyone else take over the role of getaway driver.  (Id.)

Following the robbery, Palmer testified that they first dropped Defendant off at his house.  (Id. at P. 43)   Palmer testified that afterwards, he, Chatmon and Thomas went back to the apartment that Chatmon and Thomas shared.  (Id.)  While at the apartment, Palmer testified that someone told him on Facebook that he was on the news.  (Id. at P. 43, 46)  Because of this message, the group turned on the news and saw pictures of Palmer and Thomas in the convenience store prior to the robbery.  (Id. at P. 46-47)

Palmer stated that he and Thomas met up at some point the next day to discuss what they were going to tell the police.  (Id. at P. 48-49)  Initially, Palmer testified that both Chatmon and Defendant also gave their own input and opinions as to the details of the story.  (Id. at P. 49)   Immediately thereafter, however, Palmer testified that only he, Thomas, and Chatmon formulated the false story that he and Thomas had been carjacked on the night of the robbery.  (Id. at P. 49-50, 52-53)   After he and Thomas went to the police station and the two were separated for questioning, Palmer stated that he gave the police the false story about the carjacking and that they did not believe him.  (Id. at P. 53-54)  According to Palmer, eventually the officers put a copy of Defendant's identification

in front of him and he then told them that Defendant and Chatmon had committed the robbery.  (Id. at P. 55-56)

Even during direct examination, Palmer's version of the events of the night in question was winding and inconsistent.  Throughout his testimony, Palmer was unable to recall many specific details of the night of the robbery.  During cross-examination, the defense hotly contested Palmer's credibility by attacking his apparent willingness to lie to law enforcement and to the grand jury, demonstrating his inconsistent testimony, and emphasizing his inability to remember events and recount them accurately.  (Id. at P. 78-112)

For example, Palmer could not recall or differentiate between many of the details of the allegedly false story that he initially told to police officers and the details of what actually transpired on the night of the robbery.   In regard to the actual details of the night of the robbery, Palmer could not recall how he had met up with Chatmon and Thomas before the robbery, any other stops that they made that night other than to the convenience store, or when exactly they picked up Defendant.  (Id. at P. 87-88, 96) Additionally, Palmer could not recall certain details that he had just testified to on direct, including what type of gun Chatmon owned and had used during the robbery.  (Id. at P. 104)  As to the allegedly false statements that he gave to the police, Palmer could not recall what he had told detectives about who was with him at the clubs in Tampa that night, picking up the two girls in Tampa and bringing them back to Lakeland, whether the girls were with him and Thomas when they first stopped at the convenience store, how the two masked perpetrators had carjacked them, or where they took the two girls after dropping off the carjackers.   (Id. at P. 88-94)   In regard to all of these details, Palmer

testified repeatedly that he could not recall what he told the police and he did not remember these things happening so they must have been lies he told to cover up for Chatmon and Defendant.   (See, e.g., id. at P. 90-93)

Additionally, defense counsel demonstrated Palmer's inconsistent statements regarding what the group did prior to the robbery.  On direct, Palmer testified that he, Chatmon, and Palmer went to some clubs in Tampa, then picked Defendant from his home, and then went to the convenience store.   In his testimony before the grand jury, Palmer testified that the group went to a party, not a club, before the robbery.  (Id. at P. 101)  When confronted with this testimony, Palmer stated that he did not recall exactly what the group was doing or where they were but that he knew they were partying.  (Id.) Earlier Palmer testified that the group did not go to or go into any one specific club.  (Id. at P. 85)  When further confronted with another statement that he made to detectives that the group went to Club Kathleen, Palmer testified that they might have "slid through."  (Id. at P. 105)  Additionally, Palmer was confronted with the fact that in testifying before that grand jury, he had never mentioned that the group had to go pick Defendant up from his house prior to going to the convenience store.  (Id. at P. 103)  In response, Palmer vehemently denied that he would have left that detail out.  (Id.)

### B.  Conclusion of Trial

After the conclusion of Palmer's testimony, the Government rested.  (Dkt. 84) Defendant orally moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  (Dkt. 85)  The Court held the motion under advisement.  (Id.) Thereafter, without calling any witnesses, the defense rested.  (Id.)  Subsequently, the Court instructed the jury regarding the law and again instructed the jury to disregard Eddie

Thomas's testimony in light of the violation of the rule of sequestration.  (See Dkt. 87, 88)

The Court's curative instruction to the jury regarding Thomas's testimony stated:

> At the beginning of the trial, the Court entered a sequestration order.  A sequestration order is an order that potential witnesses may not listen to or discuss the testimony of other witnesses prior to their own testimony.  The purpose of a sequestration order is to prevent witnesses from shaping their testimony to make that testimony more consistent with the testimony of other witnesses or to otherwise alter their testimony to address matters that have been elicited during that portion of the trial during which they had been excluded.  During the testimony of Eddie Thomas, he disclosed that he was held in the same cell as Joshua Chatmon, the [G]overnment's potential witness.  Outside of the presence of the jury, Eddie Thomas revealed that while he was with Joshua Chatmon they discussed the details of the robbery, the events that transpired before the robbery, and other things.  This discussion between Eddie Thomas and Joshua Chatmon was in violation of the Court's sequestration order.  As a result of this unlawful communication, the testimony of Eddie Thomas was rendered tainted and the Court has stricken that testimony in its entirety.  You are to disregard Eddie Thomas's testimony in its entirety as you have stated earlier that you would.

(Dkt. 88)

On March 7, 2014, the Jury reached a verdict, finding Defendant guilty as to Counts One, Two, and Three of the Indictment.  (Dkt. 89)  After the verdict was published, the Court denied Defendant's oral motion for judgment of acquittal, concluding that a reasonable jury could find, based on Palmer's lone identifying testimony, that Defendant was guilty beyond a reasonable doubt.  (Dkt. 93)  The Court opined that "although Palmer's testimony was questionable and could just as easily support a finding of reasonable doubt, it cannot be said the testimony was legally incredible or insubstantial on its face as those terms are defined in this Circuit."  (Id.)

On April 4, 2014, Defendant filed the instant motion, seeking a judgment of acquittal or, in the alternative, a new trial.  (Dkt. 110)   The Government opposes Defendant's requested relief.  (Dkt. 112)

16

## II.   DISCUSSION

### a.  Motion for Acquittal

Defendant moves this Court to set aside the jury verdict and enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c).   In support of his motion, Defendant relies on the same arguments previously raised in his oral motion for judgment of acquittal made at the close of the Government's case.   Defendant does not offer any reason why this Court should reconsider its earlier ruling.   The Government opposes Defendant's renewed motion, asserting that Palmer's testimony alone is sufficient to establish Defendant's guilt and that Palmer's testimony coupled with other evidence[4] offered by the Government is also sufficient to establish Defendant's guilt.

The Court finds that Defendant's renewed arguments were properly disposed of by this Court, consistent with binding law and the applicable standard of review. Therefore, the Court **DENIES** Defendant's Renewed Motion for Judgment of Acquittal for the reasons explained in the March 7, 2014 Order.  (See Dkt. 93)

### b.  Motion for New Trial

Alternatively, Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33(a).   Upon review of a motion for a new trial, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."   Fed. R. Crim. P. 33(a).   When reviewing a motion for new trial the court may "weigh the evidence and consider the credibility of witnesses."   United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985).   "If the court concludes that . . . the evidence preponderates sufficiently

---

[4] The other evidence is testimony regarding the race of the disguised perpetrator, evidence that Defendant was a classmate with the known participants of the robbery, and phone records showing Defendant attempted to contact the known participants before and after the robbery.

heavily against the verdict that a serious miscarriage of justice may have occurred, it may

set aside the verdict, grant a new trial, and submit the issues for determination by another

jury." Id. (internal quotation marks omitted).  The court may follow this course even if the

evidence is legally sufficient to sustain the verdict.  Id.  A Rule 33 motion for a new trial

"is addressed to the sound discretion of the trial court." Id.  However, the Eleventh Circuit

has stated, "[a] motion for new trial must be viewed with 'great caution.'" United States v.

Reed, 887 F.2d 1398, 1404 (11th Cir. 1989) (quoting United States v. Hall, 854 F.2d 1269,

1271 (11th Cir. 1988)).   A motion for new trial should only be granted in the most

"exceptional cases." Martinez, 763 F.2d at 1313.  Defendant contends that a new trial is

warranted because (1) the jury's verdict is contrary to the great weight of the evidence,

and (2) the rule of sequestration was violated on multiple occasions allowing the jury to

hear tainted testimony which substantially prejudiced his right to a fair trial.

Codified in Rule 615 of the Federal Rules of Evidence, the rule of sequestration

provides:

> At a party's request, the court must order witnesses excluded so that they
> cannot hear other witnesses' testimony. Or the court may do so on its own.
> But this rule does not authorize excluding:  (a) a party who is a natural
> person; (b) an officer or employee of a party that is not a natural person,
> after being designated as the party's representative by its attorney; (c) a
> person whose presence a party shows to be essential to presenting the
> party's claim or defense; or (d) a person authorized by statute to be present.

Fed. R. Evid. 615.  In the notes to Rule 615, the Advisory Committee stated that "[t]he

efficacy of excluding or sequestering witnesses has long been recognized as a means of

discouraging and exposing fabrication, inaccuracy, and collusion." Id.  The purpose of

Rule 615 is to prevent a witness from modifying his or her testimony to comport with that

of other witnesses.  See Geders v. United States, 425 U.S. 80, 87 (1976) (the rule

"exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid."). Indeed, one appeals court has observed, "[i]t is now well recognized that sequestering witnesses 'is (next to cross-examination) one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice.'" Opus 3 Ltd. v. Heritage Park, Inc., 91 F.3d 625, 628 (4th Cir. 1996) (citing 6 John H. Wigmore, Wigmore on Evidence § 1838, at 463 (James H. Chabourn ed., 1976)). Thus, "[s]crupulous adherence to [the sequestration rule] is particularly necessary in those cases in which the outcome depends on the relative credibility of the parties' witnesses." United States v. Farnham, 791 F.2d 331, 335 (4th Cir. 1986); accord Opus 3 Ltd., 91 F.3d at 629 (adherence to the sequestration rule is most important as to fact witnesses).

To justify either declaring a mistrial or granting a new trial for a violation of Rule 615, there must be a showing that the defendant's right to a fair trial was prejudiced by the violation. United States v. Lattimore, 902 F.2d 902, 903-04 (11th Cir. 1990); United States v. Jimenez, 780 F.2d 975, 980-81 (11th Cir. 1986); United States v. Womack, 654 F.2d 1034, 1040 (5th Cir. 1981);[5] United States v. Cueto, 611 F.2d 1056, 1061 (5th Cir. 1980); United States v. Eastwood, 489 F.2d 818, 821 (5th Cir. 1973). Even upon a showing of prejudice, a new trial will only be warranted when "the error affected the defendant's substantial rights." United States v. Blair, No. 8:08–cr–450–T–33EAJ, 2010 WL 1949625, at *2 (M.D. Fla. May 14, 2010). "An error affects the defendant's substantial rights if it probably had a substantial influence on the jury's verdict." Id. (citations omitted).

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

After Thomas's testimony was stricken and Chatmon was excluded as a witness, Palmer's testimony was the only source of evidence directly linking Defendant to the robbery.  The other evidence offered by the Government could not conclusively establish that Defendant was one of the disguised perpetrators.  This evidence included:  testimony regarding the race of the disguised perpetrators, evidence that Defendant was a classmate with the known participants of the robbery, and phone records showing Defendant attempted to contact the known participants before and after the robbery. Consequently, the outcome of the case rested primarily on Palmer's credibility.  During the trial, Palmer's testimony was doubtful.  He demonstrated a lapse of memory, an inability to supply details of the events leading up to the robbery, and an inability to give direct, consistent answers.  Yet, in the midst of his contradictory, inconsistent, and admittedly dishonest statements, Palmer testified that he was certain that Defendant was the perpetrator of the robbery.  As discussed above, Palmer's lone identifying testimony is legally sufficient to sustain the verdict.  That finding, however, does not foreclose the Court's ability to determine that the interest of justice requires a new trial.  Martinez, 763 F.2d at 1312.

Although Defendant's motion focuses heavily on the inconsistent and incredible testimony given by Palmer, Defendant also argues that the violations of the rule of sequestration committed by Palmer, Thomas, and Chatmon all prevented Defendant from receiving a fair trial.  (Dkt. 110 at P. 3, 9-10, 13)  Viewing the trial record as a whole, the Court finds that the issue here primarily concerns whether Palmer's inconsistent and incredible testimony was improperly buttressed by Thomas's tainted testimony, despite Thomas's testimony having been stricken in its entirety.  For the reasons discussed

below, the Court finds that under the rare and exceptional circumstances of this case, Defendant's right to a fair trial was substantially prejudiced by the jury's hearing Thomas's tainted testimony.

As detailed above, with the unwitting assistance of court personnel, Thomas and Chatmon disregarded the clear directive of the Court not to discuss the case with one another, they intentionally violated the rule of sequestration, and they connived to fill in holes in their rendition of what happened on the night in question.  It is undisputed that Thomas and Chatmon's intentional violation of the rule resulted in the jury's improperly hearing fabricated testimony.  Outside the presence of the jury, Thomas testified that he did not remember all of the details of the robbery.  Chatmon testified that Thomas, without provocation, asked Chatmon about who drove the getaway car from the robbery and, based on Chatmon's answer, Thomas tailored his testimony.  This is only one known incident in which Thomas's testimony was changed.   Due to both Chatmon's and Thomas's reluctance to fully divulge the details of their conversation to the Court, it is unclear to what extent the unlawful communication fully affected the substance of Thomas's testimony.

For guidance on this issue, the Court reviewed Eleventh Circuit and former Fifth Circuit cases that examined denials of motions for mistrial or for a new trial based on a violation of the rule of sequestration.  In United States v. Eyster, 948 F.2d 1196 (11th Cir. 1991), four government witnesses were housed together in the same jail during trial.  Id. at 1210.  At trial, it was revealed that each of the four witnesses had spoken to another witness at some point prior to or during trial.  Id. at 1210-11.  However, only two witnesses admitted that their discussion related to their testimony; specifically, the two discussed

what they each remembered about the events leading to the underlying offense.  Id. at 1211, n. 18.  The defendants moved for a mistrial or to strike the witnesses' testimony.  Id. at 1211.  The motion was denied.  Id.  Relying on United States v. Lattimore, 902 F.2d 902 (11th Cir. 1990),[6] the Eleventh Circuit held that the trial court did not abuse its discretion by denying the motion for mistrial based on the "curative nature of cross-examination," which gave the jury an adequate opportunity to evaluate the witnesses' credibility in light of their contacts and conversations with one another.  Id.  Notably, it was never shown that any of the witnesses had tailored or falsified their testimony based on their conversations.  Id.  A similar holding was reached in United States v. Jimenez, 780 F.2d 975 (11th Cir. 1986), where the Court found that the defendants' rights to a fair trial were not prejudiced despite a DEA agent's violation the rule of sequestration because the record did not indicate that the agent's testimony was influenced by the violation and his testimony was also corroborated by other documentary evidence.  Id. at 977-81.

In United States v. Womack, 654 F.2d 1034 (5th Cir. 1981), violations of the rule of sequestration were not discovered until after trial when two witnesses admitted that they had discussed their testimony with one another while waiting in the government's witness room during trial.  Id. at 1040.  The defendant moved for a new trial based on these violations.  Id. at 1041.  The motion was denied.  Id.  On appeal, the former Fifth Circuit held that the defendant was not prejudiced by the violation of the rule because the

---

[6] In Lattimore, the Government called a witness who discussed her pending testimony with three other key government witnesses who had completed their testimony. 902 F.2d at 903. The defendant moved for a mistrial on the ground that the rule of sequestration had been violated. Id. The motion was denied. Id. at 904. The Eleventh Circuit concluded that because defense counsel fully cross-examined the witness about the extent of her contacts with other witnesses, there was a curative effect to the violation.  Id.  Moreover, the Eleventh Circuit noted that the district court implicitly determined that the witness did not tailor her testimony.  Id.

witnesses' testimony at trial was corroborated by other evidence and consistent with their prior statements.  Id. at 1040-41.  Furthermore, the witnesses attested that their trial testimony was truthful despite their conversations with one another.  Id. at 1041.  Likewise, in United States v. Moriarty, 497 F. 2d 486 (5th Cir. 1974), the Court held that absent any showing that an officer's testimony had been altered based on his alleged violation of the rule of sequestration *and* a showing that his testimony was crucial to the defendant's conviction, the defendant was not entitled to a new trial.  Id. at 489.

This case is distinguishable from the cases discussed for multiple reasons.  First, in none of those cases did such an egregious or blatant violation of the rule of sequestration occur.  In this case, despite being explicitly instructed by the Court not to discuss his testimony and expressly acknowledging that he understood the Court's instruction, Thomas still proceeded to discuss the full import of his testimony with Chatmon.  Cf. Womack, 654 F.2d at 1040 (court did not instruct witnesses not to discuss testimony); Jimenez, 780 F.2d at 980 (DEA agent who committed violation was not informed of the rule); Moriarty, 497 F.2d at 489 (witness who violated the rule was called last minute and never informed of the rule); Eyster, 948 F.2d at 1211 (trial court and government were lax in upholding the sequestration rule); Lattimore, 902 F.2d at 904 (same effect).   Second, none of the discussed cases involved a jury actually hearing tainted, tailored testimony as a result of a violation of the rule, which is precisely the kind of conduct that the rule of sequestration seeks to avoid.

Additionally, the Court finds no case from this or any other Circuit addressing a jury's hearing fabricated testimony which is then stricken *in its entirety*.   However, the decision of the First Circuit in United States v. Magana, 127 F.3d 1 (1st Cir. 1997), where

only a portion of a witness's testimony was stricken, is instructive.  In that case, a witness had a conversation with the prosecutor before returning to the stand for redirect and recross-examination.  Id. at 4.  The prosecutor discussed with the witness the questions that he would ask her on redirect but the witness's intended answers were not discussed.  Id.  The defendants moved for a mistrial or to strike the witness's testimony.  Id.  The trial court denied the motion for mistrial but eventually ordered that the testimony given by the witness on redirect and recross-examination would be stricken and instructed the jury to disregard it and to only consider the testimony given by the witness on the previous day during direct and cross-examination.  Id. at 5.

On appeal, the First Circuit determined that the trial court's actions were proper because the trial judge determined that the portion of stricken testimony was brief and relatively insignificant in relation to the witness's previous testimony and that "the jury could realistically follow the instruction to put it out of their minds and consider only the previous day's testimony by the witness."  Id. at 5-6.   In coming to this conclusion the Court noted that when improper evidence is put before the jury, the trial court should "strike the offending evidence and promptly instruct the jury to disregard it."  Id. at 6.  The Court further noted that in most cases "the potential for prejudice stemming from improper testimony . . . can be satisfactorily dispelled by appropriate curative instructions," and that "[j]urors are presumed to follow such instructions, except in extreme cases."  Id. (citations omitted).

Unlike in Magana, the jury in this case heard several hours' worth of tainted testimony from Thomas regarding Defendant's alleged involvement in the robbery before the Court discovered the violation of the rule of sequestration.   After discovering the

24

unlawful communications between Thomas and Chatmon, the Court struck Thomas's testimony in its entirety and instructed the jury to disregard all of Thomas's testimony. Yet, there is an undeniable risk that striking Thomas's testimony did not and could not fully remove his fabricated testimony from the jurors' minds or prevent the jury from unintentionally using the tainted testimony to corroborate or bolster Leonard Palmer's testimony. While the Court is sensitive to drawing any conclusion about the reasoning of the jury in finding Defendant guilty of the offense, the Court also notes that Thomas testified at length and in great detail regarding Defendant's alleged involvement in the offense and the effect of his testimony cannot be ignored, primarily because Thomas's testimony substantiated much of the questionable testimony that the jury heard from Palmer the very next day.

The corroboration of seemingly innocuous facts (i.e. that the four men were all best friends in high school, where the group went prior to the robbery, where and when they picked up Defendant prior to the robbery, how they hatched the plan to tell a "false story" to the police, and the details of the alleged "false story," including which details were truly "false" and which actually occurred) all lent an air of truth and familiarity to the details recounted by Palmer during his otherwise meandering and inconsistent testimony. Indisputably, this would have been a markedly different case had the jury never heard Thomas testify at all or had the Court discovered Thomas and Chatmon's intentional violation of the rule of sequestration sooner. Instead, however, the jury heard Palmer's wandering and incomplete testimony regarding the details of the night in question as an overlay to the more comprehensive and seemingly congruent version of events given by Thomas on the previous day. Without the overlap and corroboration borrowed from

Thomas's testimony, Palmer's testimony conveyed only a piecemeal and inconsistent version of the events on the night in question.  Under these circumstances, the Court finds that it would be virtually impossible for the jury to fully excise the details of Thomas's tainted testimony from their minds and to only focus on the details recounted by Palmer. Arguably, because Palmer's testimony was bolstered and substantiated by the tainted testimony of Thomas, there is a reasonable probability that the tainted testimony had a substantial influence on the jury's verdict, particularly because no other evidence conclusively linked Defendant to the robbery.  Despite the Court's efforts in striking Thomas's testimony and instructing the jury to disregard it in its entirety, the Court concludes that these actions did not and could not cure the effect of his tainted testimony on this jury.

Additionally, the stricken testimony of Thomas further deprived Defendant of the opportunity to impeach Palmer, who could not shore up his story as to the events prior to or after the robbery.  While Thomas's testimony laid a foundation and lent an air of familiarity for Palmer's testimony, their individual renditions of the night in question also diverged to a significant extent.  For example, Palmer testified that, prior to picking Defendant up from his home, he, Chatmon, and Thomas all went to a club in Tampa, while Thomas testified that the three men were just driving around Lakeland.  Thomas testified that after the robbery all four men went back to his apartment and that Defendant called someone to give him a ride home.  In contrast, Palmer testified that the first stop the group made after the robbery was to drop Defendant off at his house.  In this context, the striking of Thomas's testimony created a distinct but equal difficulty for Defendant because he was unable to use Thomas's stricken testimony to further challenge Palmer's

credibility.  Rather than being able to highlight and draw out the differences between the two witnesses' testimonies, Defendant was forced to leave those inconsistencies ignored because any attempt at emphasizing them would run the risk of drawing the jury's attention back to the testimony of Thomas, which the Court had instructed they were to put out of their minds completely.  Moreover, in this regard, if the jury followed the Court's instructions, the inconsistencies in the testimony of these two central witnesses would have to have been disregarded as well—essentially leaving Palmer's testimony unimpeached.

The Court also notes, once again, that this violation of the rule of sequestration was not due to any intentional act of the Government.  It seems that the Marshal's office interpreted the Government's memorandum to only request the separation of the witnesses from Defendant and not as requesting that all witnesses also be kept separate from each other.  The Court notes that the Government's memorandum was potentially confusing in this manner in that it specifically stated that one additional inmate, Daniel Rachard Lee, should be "ke[pt] . . . separate from [Defendant] as well."  This of course, does not explain the Marshals office's role in the sequestration violations that occurred after the trial started.  While it is unfortunate that the Government should lose the testimony of two key witnesses through no fault of its own, in this instance, Defendant's right to a fair trial must prevail, and the truth must be sought through untainted testimony.

As such, the Court concludes that its actions to remedy the violation did not remove the taint from the trial or prevent Defendant from being prejudiced by the jury's improperly—even though unintentionally—using the tainted testimony to buttress the unreliable testimony of Palmer or by Defendant's not having the testimony of Thomas to

27

impeach Palmer.  Although Palmer's testimony, would, if introduced alone, be legally sufficient to sustain the verdict, the Court finds that under these exceptional circumstances there would be a miscarriage of justice to allow this verdict to stand. Instead, the factual issues in this case should be determined by another jury free of any tainted testimony.  See Martinez, 763 F.2d at 1312.

Accordingly, the Court **GRANTS** Defendant's alternative Motion for a New Trial, having concluded that Defendant was substantially prejudiced by the jury's hearing tainted testimony and that the Court's precautions were insufficient to cure that prejudice. The adequate remedy to guarantee that Defendant receives a fair trial is to allow a new trial in which the tainted testimony does not permeate the proceedings.  Accordingly, the Court finds that the interest of justice requires the Court to grant a new trial in this matter.

**III.    CONCLUSION**

Upon consideration of the foregoing, it is hereby **ORDERED** that Defendant's Renewed Motion for Judgment of Acquittal and, in the alternative, Motion for New Trial (Dkt. 110) is **GRANTED in part** and **DENIED in part**.  Defendant's Renewed Motion for Judgment of Acquittal is **DENIED** and Defendant's Motion for New Trial is **GRANTED**.

**DONE** and **ORDERED** in Tampa, Florida on 27th day of May, 2015

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Attorney
Counsel for the Defendant
United States Magistrate Judge
United States Marshal Service
United States Probation Office
United States Pretrial Office